THOMAS P. O'BRIEN
United States Attorney
WAYNE R. GROSS
Assistant United States Attorney
Chief, Santa Ana Office
GREGORY W. STAPLES (CBN 155505)
Assistant United States Attorney
DOUGLAS F. McCORMICK (CBN 180415)
Assistant United States Attorney
      411 W. Fourth Street, Suite 8000
      Santa Ana, California 92701
      Telephone: (714) 338-3535
      Facsimile: (714) 338-3564
      E-mail: greg.staples@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. SA CR 05-214-CJC |
| Plaintiff, | **PLEA AGREEMENT FOR DEFENDANT KEVIN JAMES** |
| v. | |
| KEVIN JAMES, et al., | |
| Defendants. | |

1.  This constitutes the plea agreement between Kevin James ("defendant") and the United States Attorney's Office for the Central District of California ("the USAO") in the above-captioned case.  This agreement is limited to the USAO and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities.

///

///

///

PLEA

2.  Defendant agrees to plead guilty to count one of the indictment in <u>United States v. Kevin James, et al.</u>, SA CR No. 05-214-CJC.

NATURE OF THE OFFENSE

3.  In order for defendant to be guilty of count one, which charges a violation of Title 18, United States Code, Section 2384, the following must be true: (1) two or more persons conspired to levy war against, or oppose by force the authority of, the United States government; (2) the defendant was a member of the conspiracy; and (3) the offense occurred in a state, territory, or place subject to the jurisdiction of the United States.  Defendant admits that defendant is, in fact, guilty of these offenses as described in count one of the indictment.

PENALTIES

4.  The statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 2384 is: 20 years imprisonment; a three-year period of supervised release; a fine of $250,000; and a mandatory special assessment of $100.

5.  Supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.  Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

6. Defendant also understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury.

7. Defendant further understands that the conviction in this case may subject defendant to various collateral consequences, including but not limited to, deportation, revocation of probation, parole, or supervised release in another case, and suspension or revocation of a professional license. Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

## FACTUAL BASIS

8. Defendant and the USAO agree and stipulate to the statement of facts provided below. This statement of facts includes facts sufficient to support a plea of guilty to the charges described in this agreement and to establish the sentencing guideline factors set forth in paragraph 12 below. It is not meant to be a complete recitation of all facts relevant to the underlying criminal conduct or all facts known to defendant that relate to that conduct.

See Attachment A.

## WAIVER OF CONSTITUTIONAL RIGHTS

9. By pleading guilty, defendant gives up the following rights:

    a) The right to persist in a plea of not guilty.

    b) The right to a speedy and public trial by jury.

    c) The right to the assistance of legal counsel at

3

trial, including the right to have the Court appoint counsel for defendant for the purpose of representation at trial.  (In this regard, defendant understands that, despite his plea of guilty, he or she retains the right to be represented by counsel - and, if necessary, to have the court appoint counsel if defendant cannot afford counsel - at every other stage of the proceedings.)

   d) The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

   e) The right to confront and cross-examine witnesses against defendant.

   f) The right, if defendant wished, to testify on defendant's own behalf and present evidence in opposition to the charges, including the right to call witnesses and to subpoena those witnesses to testify.

   g) The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

 By pleading guilty, defendant also gives up any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

### WAIVER OF DNA TESTING

 10. Defendant has been advised that the government has in its possession items of physical evidence that could be subjected to DNA testing.  Defendant understands that the government does not intend to conduct DNA testing of any of these items.  Defendant understands that, before entering guilty plea pursuant

4

to this agreement, defendant could request DNA testing of evidence in this case. Defendant further understands that, with respect to the offense to which defendant is pleading guilty pursuant to this agreement, defendant would have the right to request DNA testing of evidence after conviction under the conditions specified in 18 U.S.C. § 3600. Knowing and understanding defendant's right to request DNA testing, defendant knowingly and voluntarily gives up that right with respect to any items of evidence there may be in this case that might be amenable to DNA testing. Defendant understands and acknowledges that by giving up this right, defendant is giving up any ability to request DNA testing of evidence in this case in the current proceeding, in any proceeding after conviction under 18 U.S.C. § 3600, and in any other proceeding of any type. Defendant further understands and acknowledges that by giving up this right, defendant will never have another opportunity to have the evidence in this case submitted for DNA testing, or to employ the results of DNA testing to support a claim that defendant is innocent of the offense to which defendant is pleading guilty.

## SENTENCING FACTORS

11.  Defendant understands that the Court is required to consider the United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") among other factors in determining defendant's sentence. Defendant understands that the Sentencing Guidelines are only advisory, and that after considering the Sentencing Guidelines, the Court may be free to exercise its discretion to impose any reasonable sentence up to the maximum set by statute for the crimes of conviction.

12. Defendant and the USAO agree and stipulate to the following applicable sentencing guideline factors:

| | | | |
|---|---|---|---|
| Base Offense Level | : | 33 | U.S.S.G. § 2A1.5 |
| Adjustments- | | | |
| (Terrorism enhancement) | : | +4 | U.S.S.G. § 3A1.4 |
| (Acceptance of responsibility) | : | -3 | U.S.S.G. § 3E1.1 |

Defendant and the USAO reserve the right to argue that additional specific offense characteristics, adjustments and departures are appropriate. Defendant also understands that defendant's base offense level could be increased if defendant is a career offender under U.S.S.G. §§ 4B1.1 and 4B1.2. In the event that defendant's offense level is so altered, the parties are not bound by the base offense level stipulated to above.

13. There is no agreement as to defendant's criminal history or criminal history category.

14. The stipulations in this agreement do not bind either the United States Probation Office or the Court. Both defendant and the USAO are free to: (a) supplement the facts by supplying relevant information to the United States Probation Office and the Court, (b) correct any and all factual misstatements relating to the calculation of the sentence, and (c) argue on appeal and collateral review that the Court's sentencing guidelines calculations are not error, although each party agrees to maintain its view that the calculations in paragraph 12 are consistent with the facts of this case.

### DEFENDANT'S OBLIGATIONS

15. Defendant agrees that he will:

      a) Plead guilty as set forth in this agreement.

      b) Not knowingly and willfully fail to abide by all sentencing stipulations contained in this agreement.

      c) Not knowingly and willfully fail to: (i) appear as ordered for all court appearances, (ii) surrender as ordered for service of sentence, (iii) obey all conditions of any bond, and (iv) obey any other ongoing court order in this matter.

      d) Not commit any crime; however, offenses which would be excluded for sentencing purposes under U.S.S.G. § 4A1.2(c) are not within the scope of this agreement.

      e) Not knowingly and willfully fail to be truthful at all times with Pretrial Services, the U.S. Probation Office, and the Court.

      f) Pay the applicable special assessment at or before the time of sentencing unless defendant lacks the ability to pay.

## THE USAO'S OBLIGATIONS

16. If defendant complies fully with all defendant's obligations under this agreement, the USAO agrees:

      a) To abide by all sentencing stipulations contained in this agreement.

      b) At the time of sentencing to move to dismiss the remaining count of the indictment as against defendant. Defendant agrees, however, that at the time of sentencing the Court may consider the dismissed count in determining the applicable Sentencing Guidelines range, where the sentence should fall within that range, the propriety and extent of any departure from that range, and the determination of the sentence to be imposed after consideration of the sentencing guidelines and all

other relevant factors.

c) At the time of sentencing, provided that defendant demonstrates an acceptance of responsibility for the offense up to and including the time of sentencing, to recommend a two-level reduction in the applicable sentencing guideline offense level, pursuant to U.S.S.G. § 3E1.1; to recommend and, if necessary, move for an additional one-level reduction if available under that section; and to recommend that the Court impose a sentence of eighteen years imprisonment pursuant to the factors set forth in 18 U.S.C. § 3553.

## BREACH OF AGREEMENT

17.  If defendant, at any time between the execution of this agreement and the completion of defendant's cooperation pursuant to the agreement or defendant's sentencing on a non-custodial sentence or surrender for service on a custodial sentence, whichever is later, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached.  For example, if the defendant knowingly in an interview, before a grand jury, or at trial, falsely accuses another person of criminal conduct or falsely minimizes his own role, or the role of another, in criminal conduct, he will have breached this agreement.  If the USAO declares this agreement breached, and the Court finds such a breach to have occurred, defendant will not be able to withdraw defendant's guilty plea, and the USAO will be relieved of all of its obligations under this agreement.  In particular:

a) The USAO will no longer be bound by any agreements concerning sentencing and will be free to seek any sentence up to

the statutory maximum for the crime to which defendant has pleaded guilty.

      b) The USAO will no longer be bound by any agreements regarding criminal prosecution, and will be free to prosecute defendant for any crime, including charges that the USAO would otherwise have been obligated to dismiss pursuant to this agreement.

      c) The USAO will be free to prosecute defendant for false statement, obstruction of justice, and perjury based on any knowingly false or misleading statement by defendant.

  18. Following a knowing and willful breach of this agreement by defendant, should the USAO elect to pursue any charge that was dismissed or not filed as a result of this agreement, then:

      a) Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the commencement of any such prosecution or action.

      b) Defendant gives up all defenses based on the statute of limitations, any claim of preindictment delay, or any speedy trial claim with respect to any such prosecution, except to the extent that such defenses existed as of the date of defendant's signing of this agreement.

### LIMITED MUTUAL WAIVER OF APPEAL AND COLLATERAL ATTACK

  19. Defendant gives up the right to appeal any sentence imposed by the Court, and the manner in which the sentence is determined, provided that (a) the sentence is within the statutory maximum specified above and is constitutional, (b) the

9

Court in determining the applicable guideline range does not depart upward in offense level or criminal history category and determines that the total offense level is 34 or below, and (c) the Court imposes a sentence of 216 months or less. Defendant also gives up any right to bring a post-conviction collateral attack on the conviction or sentence, except a post-conviction collateral attack based on a claim of ineffective assistance of counsel, a claim of newly discovered evidence, or a explicitly retroactive change in the applicable Sentencing Guidelines, sentencing statutes, or statutes of conviction.

20.  The USAO gives up its right to appeal the Court's sentence, provided that (a) the Court in determining the applicable guideline range does not depart downward in offense level or criminal history category, (b) the Court determines that the total offense level is 34 or above, and (c) the Court imposes a sentence of 216 months or more.

<u>COURT NOT A PARTY</u>

21.  The Court is not a party to this agreement and need not accept any of the USAO's sentencing recommendations or the parties' stipulations. Even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from any stipulation, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty plea, and defendant will remain bound to fulfill all defendant's obligations under this agreement. No one – not the prosecutor, defendant's attorney, or the Court – can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the

statutory maximum.

## NO ADDITIONAL AGREEMENTS

22. Except as set forth herein, there are no promises, understandings or agreements between the USAO and defendant or defendant's counsel. Nor may any additional agreement, understanding or condition be entered into unless in a writing signed by all parties or on the record in court.

## PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

23. The parties agree and stipulate that this Agreement will be considered part of the record of defendant's guilty plea hearing as if the entire Agreement had been read into the record of the proceeding.

This agreement is effective upon signature by defendant and an Assistant United States Attorney.

AGREED AND ACCEPTED

UNITED STATES ATTORNEY'S OFFICE
FOR THE CENTRAL DISTRICT OF CALIFORNIA

THOMAS P. O'BRIEN
United States Attorney


_____/S/_____          _____
GREGORY W. STAPLES                       Date
DOUGLAS F. McCORMICK
Assistant United States Attorneys


I have read this agreement and carefully discussed every part of it with my attorney. I understand the terms of this agreement, and I voluntarily agree to those terms. My attorney has advised me of my rights, of possible defenses, of the Sentencing Guideline provisions, and of the consequences of entering into this agreement. No promises or inducements have

been made to me other than those contained in this agreement. No one has threatened or forced me in any way to enter into this agreement. Finally, I am satisfied with the representation of my attorney in this matter.

_____/S/_____ _____
KEVIN JAMES                                    Date
Defendant

    I am Kevin James' attorney. I have carefully discussed every part of this agreement with my client. Further, I have fully advised my client of his rights, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this agreement. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

_____/S/_____ _____
ROBERT CARLIN, ESQ.                            Date
Deputy Federal Pubic Defender
Counsel for Defendant
Kevin James

**ATTACHMENT A**

In 1997, defendant founded an organization entitled Jam'iyyat Ul-Islam Is-Saheeh ("JIS") based on his interpretation of Islam. Defendant preached the duty of JIS members to target for violent attack any enemies of Islam or "infidels," including the United States Government and Jewish and non-Jewish supporters of Israel. Defendant recruited fellow prison inmates to join JIS. Defendant required prospective JIS members to take an oath of obedience to him and swear not to disclose the existence of JIS. Defendant also required prospective JIS members to swear that they would obey a ninety day contact rule, wherein they would communicate with defendant at least once during every ninety day period.

In addition to his recruitment efforts inside prison, defendant also sought to establish groups or "cells" of JIS members outside of prison which would carry out violent attacks against perceived infidels, including the United States Government, the Government of Israel, and Jewish persons, in retaliation for the policies of the United States and Israeli governments toward Muslims throughout the world.

Beginning in December 2004 and continuing to July 5, 2005, defendant conspired with co-defendants Levar Washington ("Washington"), Gregory Patterson ("Patterson"), and Hammad Samana ("Samana") to levy war against the government of the United States through terrorism, and to oppose by force the authority of the United States government.

In furtherance of the conspiracy, defendant wrote and disseminated a document referred to as the "JIS Protocol." In the JIS Protocol, attached as Exhibit 1, defendant advocated the establishment of an Islamic Caliphate in the United States. The JIS Protocol states that "Muslims must be allowed to govern themselves by Shariah and if not we are being oppressed . . . yet we must wage the educational as well as the Organizational War or Jihad." The JIS Protocol set out the criteria for "this task." Defendant described "Jihad [as] the only true 'anti-terrorist action'[,] a defensive battle against the aggression of theological impostors led by Zionism."

The JIS Protocol further states that the "faithful mujahid are strictly forbidden to obey Kafirs or disbelievers, in fact they are commanded by Allah to battle against disbelievers . . . utilizing most strenuous effort." Defendant wrote about "Shia usurpation" of the name Hezbollah in Lebanon, and claimed that JIS would "sit back, build and attack!!! Our obvious targets being the Western forces of the US and their Kufr [sic] society, Russia, Serbia, Brittain [sic] and Isreal [sic]." The JIS Protocol states that "[i]t is important that the forementioned [sic] objectives be carried out, we are not concerned with the numbers of recruits to this movement, which was a mistake of many before us that led to the many degrees of compromise and infiltration, nor are we concerned with the lost [sic] of life in

the pursuit of our objectives; for martyrdom Fee Sabil Allah is automatic paradise."

Defendant also wrote in the JIS Protocol of the need for secrecy. In one section defendant discusses a probationary period of six months for new recruits and that the "security and clandestine movement of our group must be safeguarded hence correspondence is imperative."

Defendant also wrote a document called "Blueprint 2005," attached as Exhibit 2, which set forth the following goals for members of JIS:

- learn Arabic;

- acquire a steady job that does not interfere with learning Arabic;

- recruit five "special operations members, preferably felony free";

- "acquire two <u>Weapons (pistols)</u> with <u>silencers</u>";

- "appoint <u>a</u> member (<u>from the five</u>) to <u>find contacts for explosives or to learn bombmaking</u>. We will need bombs that can be <u>activated from a distance</u>";

- and "In order to fulfill these task [sic] you must become legitimate. Acquire identification, drivers license, work/school, keep regular contact with your parole agent, attempt to remove your tatoos and <u>monitor your look</u>. Your dress code must not bring attention . . . <u>casual dress so as not to arouse 'extremist suspicion.'</u> We have work to do."

Defendant directed JIS members to contact him every ninety days: "<u>Never</u> violate three month contact agreement which means that you must <u>never fall out of contact with me directly for any time exceeding 90 days</u>." The Blueprint concludes as follows:

> May Allah grant us victory through you, for <u>our sole purpose for residence in Dar ul-Harb</u> [house of war] has been outlined: 'O you who believe! Endure and be more patient (than your enemy), and <u>guard your territory by stationing army units (*J.I.S.)</u> Permanently at the place from where the enemy can attack you <u>(*U.S.A.)</u>, and fear Allah, so that you may be successful' 3:200.

Defendant also wrote a document called the "Notoriety Moves," which included a proposed statement to the press following attacks by JIS members. That document, attached as Exhibit 3, stated: "On missions that are done for leaving impressions the following letter will be left behind and if 187's

14

[a reference to California's homicide statute] are involved a video tape with one of our spokesman wrapted [sic] in a turban will recite this letter and be sent to <u>all</u> major news stations." The proposed letter reads as follows:

> This incident is the first in a series of incidents to come in a plight to defend and propagate traditional Islam in its purity. We advise those sincere believers in Allah and followers of the Sunnah of his Messenger to teach their children the importance of staying within the bounds of the Shariah because if you as parents won't inforce [sic] it, the community will.  We also advise those sincere Muslims of the ahl-Sunnah wa'l Jama'at to abstain from socializing and or aiding the following targets of Jama'at Islami As-Sahih:
>
> * The so-called Nation of Islam and its idol worshiping supporters of Farrakhan.
> * The so-called "American-Muslims" or those who follow Warith D. Muhammed's transgression against traditional Islam and the Sunnah (Hadith) of the Messenger of Allah (saw).
> * Those so-called Muslims who trash the four schools of Islamic law and qualified scholarship in Islam.
> * Those so-called Muslims labelled [sic] Shi'i, and supporters of the infidel state of Iran.
> * Those so-called Muslims who believe it permissible to join or support the American Army (military) in any way.
> * Those so-called Muslims who are employees of non-Islamic government institutions that are blatantly in opposition to the laws and religion of Islam.
> * Those Jewish and non-Jewish supporters of an Israeli state.
>
> <u>All</u> who fall under the previously mention has [sic] a legitimate reason to fear for their safety.  We are <u>not</u> extremists, radicals, or terrorists.  We are only servants of Allah and lovers of the Sunnah, our actions will gladly be corrected with proof from Islamic sources . . . Once again, I advised [sic] the masajid of America to hire or seek qualified imams to govern over your Islamic centers and restore Islamic Shariah to your areas.  If by doing this you come into opposition from local law enforcement then know that it's

15

1  time for you to migrate.  <u>Allahu</u> <u>Alim</u>!

2  *Jama'at Islami As-Sahih*

3  Defendant recruited Washington into JIS while both were inmates at New Folsom Prison, and had Washington swear an oath of
4  loyalty and obedience to defendant and JIS.  In furtherance of the conspiracy, after his release from prison, Washington
5  recruited Patterson and Samana into JIS and had them swear oaths of allegiance and obedience to JIS.

6
   In furtherance of the conspiracy, defendant committed the
7  following acts, among others:

8  a.  In December 2004, defendant instructed Washington to (1) recruit five individuals without felony convictions and train
9  them in covert operations; (2) acquire two firearms with silencers; and (3) appoint an individual from the group he
10 recruited to find contacts for explosives or learn to make bombs that could be activated from a distance.

11
   b.  Between December 2004 and July 5, 2005, defendant wrote
12 letters to Washington advising him on how to recruit new members for JIS and instructing Washington to take Patterson to a mosque
13 in San Diego to look for new recruits.  Defendant also asked Washington to send him copies of the JIS Protocol for defendant
14 to distribute in prison.

15 c.  Between December 2004 and July 5, 2005, defendant wrote a letter to Washington which stated the following: "<u>Be careful
16 Akhi [brother], there are agents everywhere looking for Al-Qaida recruiters or any other threat to national security.  This is
17 another reason why I haven't commended any of our members already out there to move forward</u>.  Their work must <u>remain</u> totally
18 charitable and educational.  Your squad will be engaged on <u>all</u> levels."

19
   d.  In March 2005, defendant wrote a letter to Washington
20 telling him that Patterson should keep his job at Los Angeles International Airport and that "al-Bakistani" [referring to
21 Samana] "should also be a very beautiful asset."

22 e.  In March 2005, defendant sent Washington a visitor's slip to arrange for Patterson to visit defendant in prison.
23
   f.  In May 2005, defendant sent Washington a visitor's slip
24 for Samana to visit defendant in prison.

25 g.  In June 2005, defendant sent Washington a letter saying that defendant was sending Washington a "young comrade" who was a
26 "walking martyr."  Defendant told Washington to place the recruit "under your command" and that "global plight" would be "his
27 focus."

28 Defendant admits that the above-listed overt acts were in

16

furtherance of the conspiracy to retaliate against the governments of the United States and Israel by attacking targets in Southern California associated with the U.S. military and the Jewish religion.